UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**SCARINCI HOLLENBECK, LLC**
**DAVID EDELBERG, ESQ.**
**JOHN GIAMPOLO, ESQ.**
150 Clove Road, 9th Floor.
Little Falls, New Jersey 07424
(201) 896-7701 (Tel)
(201) 896-7084 (Fax)
dedelberg@sh-law.com
jgiampolo@sh-law.com

*Co-Counsel for Canara Bank, New York Branch and Union Bank of India (UK) Limited*

| In Re: VERIA LIFESTYLE INC. Debtor. | Chapter 11 (Subchapter V)<br>Case No.: 26-21232 (CMG)<br>The Honorable Christine M. Gravelle<br>Hearing Date: October 27, 2026 at 1:00 p.m. |
|---|---|

**APPLICATION OF CANARA BANK, NEW YORK BRANCH AND UNION BANK OF INDIA (UK) LIMITED IN OPPOSITION TO DEBTOR'S MOTIONS FOR DEBTOR-IN-POSSESSION FINANCING, USE OF CASH COLLATERAL, AND GRANTING BANK'S CROSS MOTION SEEKING RELIEF FROM THE AUTOMATIC STAY AND GRANTING RELATED RELIEF**

Canara Bank, New York Branch ("Canara") and Union Bank of India (UK) Limited ("Union Bank") and together with Canara, the "Banks"), holders of first priority prepetition liens on substantially all assets of the above-captioned debtor (the "Debtor"), further evidenced by a $73 million foreclosure judgment (the "Foreclosure Judgment") against the Debtor, through the Banks' undersigned co-counsel, submit this application, together with the accompanying declaration of Appen Menon, Esq. (the "Menon Dec"), in support of the Banks' opposition to the Debtor's Motions Seeking Debtor-in-Possession Financing ("DIP Financing"), and Use of Cash Collateral; and in support of the Banks' Cross Motion Seeking Relief from the Automatic Stay

in order to proceed with a foreclosure sale of the Debtor's real property, or alternatively, dismissing the Debtor's Chapter 11 case due to a lack of proper, corporate authorization.

## INTRODUCTION

During the first day hearing this Court observe that: "***The filing of this bankruptcy sounds like it's a total failure***." The Debtor seeks to continue operating in Chapter 11 with the same management and business plan that has lost over $44 million dollars during the past five (5) years. See Exhibit T to the Menon Declaration. Such five (5) year summary further reflects a precipitous sixty-two (62%) percent drop in the Debtor's revenues from $4,173,933.00 in 2022 to $1,546,016.00 during the fiscal year ending March 31, 2026. *Id.* The Debtor's current budget reveals ongoing red ink. As a result, the Debtor will run out of money in sixty (60) days even if the $1.75million dollar DIP financing is approved.

As demonstrated herein, the DIP Financing serves no sound business purpose. As admitted by the Debtor's CEO, the DIP Loan will be exhausted, as will the Debtor's operating funds, by January. As further admitted by the CEO, he has no idea what the Debtor will do to find funds in order to continue operating. As a result, the Debtor lacks any business plan whatsoever.

Moreover, the DIP Financing lender, Natural Wellness UK Limited ("Insider DIP Lender") is an insider, the sole owner of the immediate parent, and a co-judgment debtor/guarantor of the $73 million Foreclosure Judgment. Upon information and belief, both Debtor and the Insider DIP Lender are owned and controlled by Subhash Chandra who is also a co-judgment debtor and subject to an insolvency proceeding in India. Upon information and belief, the Insider DIP Lender is also a large pre-petition unsecured creditor herein, having a balance due of $300,000.00.

Simultaneously, the Debtor cannot afford to adequately protect the Banks' liens by remitting monthly interest only payments of $550,000.00. Accordingly, the final order for DIP Financing should be denied as serving no rational business purpose. In addition, the Banks should be granted relief from the automatic stay in order to proceed with a judicial foreclosure sale.

Finally, Mr. Goyal signed the Debtor's corporate resolution authorizing its Chapter 11 filing as the Debtor's sole stockholder and the sole member of the Debtor's Board of Directors. However, during questioning at the First Day Hearings Mr. Goyal could not identify the Debtor's individual shareholders nor the individual shareholders of the Debtor's parent companies. Similarly, counsel were unable to identify such individuals, nor the individual shareholders of the Insider DIP Lender.

Upon information and belief, the Debtor is unable to meet is burden of showing that its Chapter 11 filing was properly authorized. Consequently, the Debtor's Chapter 11 case must be dismissed.

**BACKGROUND AND PROCEDURAL HISTORY**

1. The Debtor operates a health and wellness resort operating under the name of YO1 Longevity & Health Resorts. The resort owns and is located on a 1,300-acre property, with 131 guest rooms, located in Monticello, New York (the "Premises"). See Declaration in Support of First Day Motions [ECF No. 9] ¶ 4; see also Tr., p. 5:23-25, p. 6:1-5. The Debtor is seeking to continue operating in Chapter 11 with the same management and non-existent business plan that has admittedly lost the Debtor over $44 million dollars during the past five (5) years. See Exhibit T. Such losses are continuing unabated as reflected by the Debtor's budget

2. The Debtor purchased the Premises in 2013. On June 22, 2016, Canara agreed to provide up to $45 million in loans available to the Debtor for construction and site improvements to the Premises. In September 2016, Union Bank became a participant in the above loans.

3. On October 2, 2026 (the "Petition Date"), the Debtor filed a voluntary petition [ECF No. 1] (the "Petition") for relief under Chapter 11 the Bankruptcy Code. At that time the Debtor requested an expedited first day hearing (the "First Day Hearing") the following Monday, October 5, 2026. The First Day Hearing included arguments regarding the Debtor's Motion for approval of DIP Financing and Use of Cash Collateral. A copy of the transcript from the First Day Hearing (the "Transcript" or "Tr") is attached as **Exhibit A** to the Menon Dec.

4. The Debtor apparently filed this case to avoid the foreclosure sale scheduled for October 14, 2026. Copies of the notice of sale and the Foreclosure Judgment are attached as **Exhibits B** and **C**, respectively, to the Menon Dec.

***The DIP Motion and the First Day Hearing***

5. The First Day Hearings were conducted on October 5, 2026. At that time, it became apparent that the debtor is suffering from large, ongoing loses; and has no business plan for reversing such losses.

6. At the First Day Hearing the Debtor had not yet presented any information regarding the value of its real property, the identities and values of the Debtor's other assets, nor an overview of any liens, priority claims and unsecured claims.

7. The Banks have subsequently discovered that the Debtor has *lost over $44 million dollars* during its most recent five (5) year period. See Exhibit T. In addition, the Debtor's budget demonstrates that the Debtor's large losses are ongoing - - and that the Debtor

will run out of money in sixty (60) days. Strikingly, the Debtor has no idea how it will reverse its enormous losses or continue operating past January.

8. The Insider DIP Lender is purportedly the sole owner of the Debtor's immediate parent. The DIP Motion also did not disclose that the Insider DIP Lender is jointly and severally liable as a guarantor and co-debtor for the Banks' $73 million Foreclosure Judgment. See the Foreclosure Judgment, Exhibit B, p. 6.

9. The Debtor has failed to clarify who owns and controls the Debtor and establish that its Chapter 11 filing was properly authorized. The DIP Motion failed to disclose that the Insider DIP Lender is, upon information and belief, a pre-petition, unsecured creditor owed $300,000.00.

10. Upon information and belief, a Mr. Subhash Chandra, another guarantor and co-debtor for the Foreclosure Judgment, ultimately owns and controls the Debtor and its parent companies, including the Insider DIP Lender,[1]. See Exhibit A, Tr., p. 14:2, 17-18. Nor was it disclosed that Subhash Chandra was the debtor in a personal insolvency proceeding in India.[2]

11. The Debtor's recently filed Corporate Disclosure Statement indicates that Mr. Chandra may have transferred his interests in the Debtor and its affiliates to his son, Amit Goenka,[3] a clear breach of the Debtor's loan agreements with the Banks.

---

[1] See the organizational chart (the "Organizational Chart"), attached as to the Menon Dec as **Exhibit X**, which was provided by the Debtor during the underwriting process for the Banks' loans.

[2] "In 2026, Chandra underwent personal insolvency proceedings under the Insolvency and Bankruptcy Code". See Subhash Chandra's Wikipedia profile attached to the Menon Dec as **Exhibit Z**; see also one of the 2025 filings from Subhash Chandra's personal insolvency proceeding in India attached to the Menon Dec as **Exhibit A-1**listing Subhash Chandra's liability to Canara for the Debtor's loan on page 2 of 5.

[3] See the Debtor's October 15, 2026 Corporate Ownership Statement [ECF No. 38], stating that 100% of the interests in the Debtor and its parent companies are now held by Amit Goenka, who is identified as Subhash Chandra's son in Amit Goenka's Wikipedia profile attached to the Menon Dec as **Exhibit Y**.

***The Interim DIP Financing Order***

12. Ultimately, this Court entered an interim order on October 14, 2026, approving a reduced amount of up to $400,000 of DIP Financing on an interim basis through the date of the final hearing with "[t]he rights of all parties in interest subject to the entry of a Final DIP Order are reserved" including that "[t]he Banks reserve all rights to seek a post-petition lien upon any avoidance actions or other unencumbered assets, if any." [ECF No. 33].

**THE BANKS HAVE A FIRST PRIORITY LIEN UPON ALL OF THE DEBTOR'S ASSETS**

13. The Banks have first priority liens on all of the Debtor's assets arising from the loan documents and the Foreclosure Judgment outlined below.

14. On or about June 22, 2016, Canara and the Debtor executed a "Building Loan Agreement" pursuant to which Canara made available to Debtor a "Building Loan" up to $25 million. Another $20 million dollars of the $45,000,000 Building Loan was to be financed by other lenders joining the Building Loan Agreement. A copy of the Building Loan Agreement is attached as **Exhibit D** to the Menon Dec.

15. On or about September 19, 2016, a "Novation Agreement" was executed by Union Bank, Debtor and Canara. Pursuant to such agreement Union Bank became a party to the Building Loan Agreement and financed up to $12,500,000 in additional loans to the Debtor. A copy of the Novation Agreement is attached as **Exhibit E** to the Menon Dec.

16. To secure the Debtor's obligations under the Building Loan Agreement the Debtor executed and delivered to Canara, among others, the following:

a. A "Build Loan Mortgage, Security Agreement and Fixture Filing" dated June 22, 2016 (the "Mortgage") and recorded on June 24, 2016, as instrument number 2016-4450 with Sullivan County Clerk's Office, encumbering all of the Debtor's

Premises, including all existing and after acquired fixtures, in favor of Canara in its capacity as "Security Agent" under the Building Loan Agreement and securing the principal sum of $45,000,000. A copy of the recorded Mortgage is attached as **Exhibit F** to the Menon Dec.

b. A "Security Agreement" dated June 22, 2016 granting Canara a security interest in all of the Debtor's then existing and subsequently acquired personal property (collectively, the "Personal Property"), including, but not limited to, all of the Debtor's accounts, cash proceeds, chattel paper, commercial tort claims, deposit accounts, documents, electronic chattel paper, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, letter of credit rights, noncash proceeds and payment intangibles. A copy of the Security Agreement is attached as **Exhibit G** to the Menon Dec.

17. The Debtor's obligations are further secured by a Uniform Commercial Code financing statement naming the Debtor as debtor and Canara as secured party, filed with the Delaware Secretary of State's Office on October 28, 2021, at 2021 8664055 (the "UCC-1"). A copy of such filed UCC-1 is attached as **Exhibit H** to the Menon Dec.

18. Debtor's obligations are also secured by a Uniform Commercial Code financing statement filed with the New York Secretary of State on October 28, 2021, as file # 202110288480174. A copy of such filed UCC-1 is attached as **Exhibit I** to the Menon Dec.

19. The Building Loan Agreement, Mortgage, Security Agreement, and all other documents executed by the Debtor in connection with the Building Loan are collectively referred to herein as the "Loan Documents".

20. Subhas Chandra executed a "Guaranty" dated June 22, 2016 (the "Chandra Guaranty") in favor of Canara as Premises Agent. Under the terms of the Chandra Guaranty, Subhas Chandra absolutely and unconditionally guaranteed the payment of the Debtor's obligations under the Loan Documents. A copy of the Chandra Guaranty is attached as **Exhibit J** to the Menon Dec.

21. Veria Lifestyle Capital executed a "Corporate Guaranty" dated June 22, 2016 (the "Veria Lifestyle Capital Guaranty") in favor of Canara as Premises Agent. Pursuant to the Veria Lifestyle Capital Guaranty, Veria Lifestyle Capital absolutely and unconditionally guaranteed the payment of Debtor's obligations under the Loan Documents. A copy of the Veria Lifestyle Capital Guaranty is attached as **Exhibit K** to the Menon Dec.

22. The Insider DIP Lender executed a "Corporate Guaranty" dated June 22, 2016 (the "Insider DIP Lender Guaranty") in favor of Canara as Premises Agent. Pursuant to the Insider DIP Lender Guaranty, the Insider DIP Lender absolutely and unconditionally guaranteed the payment of the Debtor's obligations under the Loan Documents. A copy of the Insider DIP Lender Guaranty is attached as **Exhibit L** to the Menon Dec.

23. The Chandra Guaranty, the Veria Lifestyle Capital Guaranty and the Insider DIP Lender Guaranty are collectively referred to as the "Guarantees"; and the Chandra Guaranty, the Veria Lifestyle Capital and the Insider DIP Lender are collectively referred to as the "Guarantors".

## THE BANKS OBTAINED A $73 MILLION FORECLOSURE JUDGMENT AGAINST THE DEBTOR AND THE GUARANTORS.

24. On December 4, 2019, the Banks delivered written notice of default to the Debtor based on (i) nonpayment of interest due October 31, 2019, (ii) failure to provide audited financials for the Insider DIP Lender, and (iii) failure to establish a debt reserve account by March 31, 2019.

The Debtor was advised that absent a cure of the above defaults the loan would be accelerated and the default interest rate would be triggered.

25. On December 27, 2019, notice of acceleration of debt was issued to the Debtor and later reaffirmed in a November 12, 2021 letter.

26. On January 26, 2022, following a multiyear Covid moratorium, the Banks filed the foreclosure complaint against the Debtor and the Guarantors. A copy of the Complaint is annexed as **Exhibit M** to the Menon Dec (the "Foreclosure Action").

27. On September 11, 2024, an Order was entered in the Foreclosure Action: (i) granting the Banks' motion for summary judgment on their claims; (ii) appointing a referee to compute the amounts owed to the Banks; (iii) granting summary judgment dismissing the Debtor's counterclaims; and (iv) denying Debtor's request to vacate the note of issue. See Index No. E2022-152 [Doc. No. 216] a copy of which is annexed as **Exhibit N** to the Menon Dec.

28. On October 8, 2024, an Order was entered appointing a referee to determine amounts due to the Banks and stated " . . . that on the filing of the Referee's Report [of amount due] and Oath and confirmation thereof, [the Banks] shall have final judgment of foreclosure and sale." See Index No. E2022-152 [Doc. No. 222] a copy of which is attached as **Exhibit O** to the Menon Dec.

29. Thereafter, the Debtor appealed the order granting the Banks' summary judgment motion and moved for a stay of the Foreclosure Action pending appeal. On February 11, 2025, a stay pending appeal was granted.

30. On January 22, 2026, the Debtor's appeal was denied, upholding the Banks' summary judgment award, dismissing the Debtor's counterclaims, and ordering the entry of an order for referral back to the referee.

31. On April 13, 2026, the referee's computation of the balance due to the Banks was filed with the Court. A copy of such report is attached as **Exhibit P** to the Menon Dec. See Index No. E2022-152 [Doc. No. 244].

32. On August 24, 2026, the Foreclosure Judgment was entered in favor of the Banks against each of the Debtor and Guarantors for over $73 million dollars. Thereafter a notice of sale was issued scheduling a foreclosure sale of the Premises on October 14, 2026. See Index No. E2022-152 [Doc. Nos. 295-300].

**THE DEBTOR HAS LOST OVER $44 MILLION DOLLARS DURING THE PAST FIVE YEARS; CONTINUES TO SUFFER LOSSES, AND HAS NO STRATEGY FOR REVERSING THESE LOSSES. THEREFORE, THE DIP FINANCING APPLICATION MUST BE DENIED**

33. As previously noted, the Debtor seeks DIP Financing in order to continue operating in Chapter 11 with the same CEO and same business plan that has admittedly lost over $44 million dollars during the past five (5) years. See Exhibit T.

34. The Debtor's CEO apparently sought to downplay these enormous losses during his testimony at the First Day Hearing, only admitting to annual losses of approximately $2 million dollars during the past six (6) years. In this regard, the CEO testified:

> A We lose about $2 million a year.
>
> Q All right. And that's year-to-date for 2026?
>
> A Yeah, it's since six years I'm managing this business as the CEO. And –
>
> Q So in the past six years, you've been losing approximately $2 million each of the last six years. Is that correct?
>
> A Something like about $200,000, $150,000 to $200,000 a month.

Tr., p. 18:11-21.

35. Crucially the Debtor admits that the DIP Loan will be exhausted by January 2027, and that the Debtor has absolutely no plan what it will do when it runs out of money in sixty (60) days. See Tr., p. 22:1-18.

> Q And based on the losses that we're seeing here, which is, as I calculated, a loss of about $126,000 per week, the DIP loan will be exhausted in January, correct –
>
> A That's right.
>
> Q -- or sooner?
>
> A Yeah. January.
>
> Q And at that point, the debtor will run out of money, correct?
>
> A But that's the time we are planning to use to restructure and rework our plans.
>
> Q Well, tell me about the restructure.
>
> A That's why we are filing Chapter 11.
>
> Q Tell me about the restructure.
>
> A Yeah. So that's something that we are working on. So it's not -- the plan is not ready yet. That's why we are asking for 13 weeks time.
>
> Q Well, you know that you've been in foreclosure for four years, correct?
>
> A Yeah.

Tr., p. 21:25, p. 22:1-18.

36. As admitted by the Debtor's CEO, the Debtor has no idea what will happen when it runs out of money in sixty (60) days. (emphasis added).

> Q *Is it fair to say that you don't know how the debtor will restructure when it runs out of money in January? Is that correct?*

> A Sir, all I said is we are working on the plan. At this time, *I don't have a ready answer as to how we'll come out of it*, but we are very much believing that we'll be able to come out of it.

See Tr., p. 23:11-19 (emphasis added).

37. The Debtor's five fiscal year Statement of Operations - - Five Fiscal Years Plus Interim demonstrates the Debtor's impossible situation. Exhibit T. Such statement reflects total losses of over $44 million dollars during the Debtor's most recent five fiscal years. *Id.*

38. Such statement further shows a dramatic, sixty-two (62%) *decrease* in revenues during the past five (5) years. In 2022 the Debtor's revenues were $4,173,933.00. By the end of Fiscal Year End March 31, 2026, revenues had decreased by more than half to $1,546,000.00. Thus, the Debtor's awful financial operations are going from awful to the current, complete disaster.

39. DIP Financing cannot be approved absent a legitimate business purpose that benefits the estate by applying sound and reasonable business judgment. *See In re Ames Department Stores, Inc.,* 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (DIP financing must be an exercise of sound and reasonable business judgment and cannot be approved if it would only benefit the lender or lacks a reorganization purpose); *see also In re Tenney Village Co., Inc.,* 104 B.R. 562 (Bankr. D.N.H. 1989) (DIP financing cannot be approved when it lacks legitimate business justification).

40. As demonstrated by the above testimony, the Debtor's CEO has no clue how the Debtor might stem its losses. The Debtor does not have a sound business plan - - the Debtor has NO plan. This is not a sound business judgment by a debtor. This is a disaster.

41. As a result, the DIP Financing offers absolutely no benefit to the Debtor's estate. Its sole function is to "kick the can" sixty (60) days down the road when the Debtor will once again

be bereft of operating funds - - and continue to be clueless about how it can reverse its unbelievable and long-standing track record of enormous losses.

42. As a result, the Debtor's request for DIP Financing is akin to driving a car off of a high cliff. Simply put, this Debtor has no idea of what to do.

43. The DIP Financing provides absolutely no benefit to the estate. It merely continues the Debtor's disastrous losses for another sixty (60) days with a Debtor that offers no clue of how it will address its massive losses.

44. As this Court correctly observed during the First Day Hearing, "*[t]he filing of this bankruptcy sounds like it's a total failure*." See Tr., p. 24:19-20 (emphasis added).

45. Moreover, as an insider transaction the DIP Financing is subject to heightened scrutiny, which it cannot satisfy.

46. The business judgment rule is inapplicable to transactions between a debtor and an insider, which transactions are inherently suspect because "they are rife with the possibility of abuse." *In re Bidermann Indus. U.S.A. Inc.,* 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (quoting *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)). *See also Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (noting that a controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny); *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.),* 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (internal citations omitted).

47. Thus, an insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the "entire fairness" of the transaction at issue. *See WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*,

227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage[,] insiders' loans in a bankruptcy must be subject to rigorous scrutiny." (citation omitted)).

48. For the reasons above, the DIP Financing cannot stand up to scrutiny, especially not the heightened scrutiny applicable to insider transactions.

**THE WIDE-RANGING APPRAISED VALUATIONS OF THE DEBTOR'S PREMISES.**

49. To date, three valuation reports have been located. Pursuant to an appraisal, dated February 28, 2023, prepared for the Debtor by Kroll Real Estate Advisory Group, valued the Debtor's Premises at $151,600,000.00. A copy of the above appraisal is attached to the Menon Dec as **Exhibit U**.

50. Pursuant to an appraisal, dated May 7, 2026, prepared for the Banks by HVS Consulting & Valuation, Division of TS Worldwide, LLC, the value of the Premises is $12,500,000.00, plus an "Excess Land Value" of $2,300,000 for a total of $14,800,000.00. A copy of such appraisal is attached to the Menon Dec as **Exhibit V**.

51. Pursuant to an appraisal, dated June 15, 2026, prepared for the Debtor by Capright, valued the Premises "(including Excess Land)", to be $46,200,000.00. A copy of such appraisal is attached to the Menon Dec as **Exhibit W**.

**THE DEBTOR'S CHAPTER 11 FILING WAS NOT PROPERLY AUTHORIZED. THEREFORE, THE DEBTOR'S CHAPTER 11 CASE MUST BE DISMISSED**

52. "The Bankruptcy Code provides that 'on request of a party in interest, and after notice and a hearing, the court shall ... dismiss a case under [Chapter 11] ... for cause." 11 U.S.C. § 1112(b)(1). Such '[c]ause' … includes occasions when a debtor 'did not have the proper authority to commence the ... bankruptcy proceeding.' " *In re Whittaker, Clark & Daniels, Inc.*, 176 F.4th

241, 253-254 (3d Cir. Apr. 26, 2026) (quoting *In re 3P Hightstown, LLC*, 631 B.R. 205, 209 (Bankr. D.N.J. 2021)).

53. The Bankruptcy Court has the authority to dismiss a bankruptcy petition for cause under Section 1112(b) on its own motion.' " *3P Hightstown, LLC*, 631 B.R. at 209 (quoting *In re Munteanu,* No. 06-6108, 2007 WL 1987783, at *3 (E.D.N.Y. June 28, 2007)).

54. "In addition, the Court has authority to dismiss this case without relying on § 1112(b) [because,] [s]hould a court find 'that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, *it has no alternative but to dismiss the petition*.' " *3P Hightstown, LLC*, 631 B.R. at 209 (quoting *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945)) (emphasis added).

55. " 'In absence of federal incorporation, that authority finds its source in local law' [and] [s]tate law thus determines who has the authority to file a voluntary petition on behalf of the corporation." *In re Franchise Servs. of N. Am., Inc.,* 891 F.3d 198, 206 (5th Cir. 2018) (cited by *3P Hightstown, LLC*, 631 B.R. at 211 and quoting *Price*, 324 U.S. at 106-107). "If the petitioners lack authorization under state law, the bankruptcy court 'has no alternative but to dismiss the petition.' " *Franchise Servs.,* 891 F.3d at 206-207 (quoting *Price*, 324 U.S. at 106-107). "It is not enough that those who seek to speak for the corporation may have the right to obtain that authority." *Price*, 324 U.S. at 106-107. "Rather, they must have it at the time of filing." *Franchise Servs.,* 891 F.3d at 206-207 (citing *Price*, 324 U.S. at 106-107).

56. Here, the Debtor is "a corporation created and existing under the laws of the State of Delaware". See Petition [ECF No. 2-2].

57. Here, neither Debtor's counsel, its CEO nor the Insider DIP Lender's counsel could provide basic disclosures regarding the identity of the individual(s) that own and control the Debtor, its parent companies, or the Insider DIP Lender.

58. Attached to the Debtor's Petition is a Joint Written Consent of the Sole Stockholder and Board of Directions of Veria Lifestyle Inc. ("Resolution") and Certificate of Incumbency purporting to authorize Debtor's Petition filing in this case. Both are signed by Harish Goyal (i) as the sole member of the Debtor's Board of Directors, and (ii) as the Debtor's sole stockholder, ("The undersigned, being the sole stockholder (the "Stockholder") and the sole member of the Board of Directors (the "Board") of Veria Lifestyle, Inc. . . . .") See the first two lines of the Resolution.

59. It is inconceivable that the Debtor's CEO, sole stockholder and purported sole board member could not identify: (i) the individual(s) that owned and controlled the Debtor; (ii) the individual(s) that owned and controlled the Debtor's immediate parent company, nor (iii) the individual(s) that owned and controlled the Insider DIP Lender.

60. Respectfully, who authorized the Debtor's Chapter 11 filing?

61. The Debtor's purported sole board member cannot identify the individual(s) that owns and controls the Debtor, the Debtor's parent company or the Insider DIP Lender.

62. Incredulously, during the First Day Hearing, Harish Goyal could not answer who owns and controls the Debtor and its parent companies. When asked, he was unable to identify who owns or who is involved with or even the basic structure of the Insider DIP Lender, Natural Wellness UK Ltd, UK, which, as above, is the 100% owner of the Debtor's immediate parent, Veria Lifestyles Capital, LLC, which Harish Goyal claimed to be a Director of when he signed the Debtor's Petition.

Q Referring to the DIP lender, insider lender, can you tell me who -- is that a corporation or an LLC?

A Its name is Natural Wellness UK. It's a UK-based company.

Q And does it have members or shareholders?

A I'm not entirely aware of the structure of Natural Wellness UK.

Q Can you tell me what individuals own either shares or membership interests in the DIP lender?

A I'm not aware of the individuals who are involved with Natural Wellness UK.

Q *Can you tell me whether or not the same individuals who own the debtor through VLC or otherwise, are the same individuals who control the insider lender?*

A *I don't know the individuals who own Natural Wellness UK, so I won't be able to answer it.*

TR. p. 22:21-25, p. 23:1-11 (emphasis added).

63. An Organizational Chart provided by the Debtor to the Banks at the time the subject loans were underwritten is attached to the Menon Dec as **Exhibit X.** Such Organizational Chart reflects that the Debtor and its parent companies are owned and controlled by a husband and wife named: (i) "Dr Subash Chandra" a/k/a Subhash Chandra and Subhash Chandra Goenka ("Subhash"), and (ii) his wife, "Sushila Goenka", a/k/a Sushila Devi ("Sushila").[4]

64. The Organizational Chart reflects that the Debtor is 100% owned by its immediate parent, Veria Lifestyles Capital, LLC, which is 100% owned by the Insider DIP Lender, Natural Wellness UK Ltd, UK, which is owned by multiple other entities, 48% of which are ultimately held by Subhash and 51% of which are ultimately held by Sushila.

[4] See the screenshot printout of Subhash's Wikipedia profile attached to the Menon Dec as **Exhibit Z** (https://en.wikipedia.org/wiki/Subhash_Chandra).

65. Additionally, public records[5] reflect that the Debtor's parent companies, including the Insider DIP Lender, are "ultimately held by Dr Subhash Chandra and family".

66. Neither the Petition nor the Resolution are signed by Subhash or Sushila, the only two individuals reported to own 100% of the interests in the Debtor and its parent companies. As demonstrated above, the Resolution is only signed by Harish Goyal who dubiously claims to be the sole member of the Debtor's Board of Directors and the Debtor's sole stockholder.

67. Furthermore, the Debtor's recently filed Corporate Ownership Statement reflects that Subhash and Sushila may have transferred their interests in the Debtor and its parent companies to another individual, their son Amit Goenka, in violation of covenants under the Banks' Loan Documents. The Corporate Ownership Statement states:

> For avoidance of doubt, the Debtor is 100% owned by Veria Lifestyle Capital LLC ("VLC LLC"). VLC LLC is 100% owned by Natural Wellness UK Limited ("UK Parent"). UK Parent is 100% owned by Keys River Trading, an entity formed under the laws of British Virgin Islands. Keys River is 100% owned by an individual, Amit Goenka, UBO.

See Corporate Ownership Statement [ECF No. 38].

68. The Debtor's Resolution is **not** signed by Amit Goenka. Moreover, Mr. Goyal was clueless regarding Mr. Amit Goenka's identity or role with the Debtor.

69. Debtor's bankruptcy counsel was also unable at the First Day Hearing to provide basic disclosure about which individuals own and control the Debtor and its parent companies, including the Insider DIP Lender. No one could provide any information regarding Subhash or Sushila. When asked about such individuals, Debtor's counsel could only say it was "[his]

---

[5] See attached to the Menon Dec as **Exhibit A-2** the screenshot printout of careratings.com profile for the Debtor reporting that, as of December 15, 2025: "Veria Lifestyle Inc … is promoted by Dr. Subhash Chandra and is a part of the Essel group. It is a wholly owned subsidiary of Veria Lifestyle Capital, LLC which in turn is a wholly owned subsidiary of Natural Wellness UK which is ultimately held by Dr Subhash Chandra and family." (https://www.careratings.com/upload/CompanyFiles/PR/202512121237_Veria_Lifestyle,_INC.pdf).

understanding … that Dr. Chandra has no officer position at any of the parent levels of the [Debtor]" but could not provide any explanation why Chandra would have guaranteed Debtor's $45 million loan to the Banks if Chandra had no position with or interest in the Debtor.

> THE COURT: But is Dr. Chandra related to the debtor or any of its parents?
>
> MR. ROLDAN: My understanding, Your Honor, and I believe Mr. Goyal would testify, is that Dr. Chandra has no officer position at any of the parent levels of the company. Certainly not the debtor, not at the intermediate LLC, which owns the debtor, not at Natural Wellness UK, which is our DIP lender. No management, no financial interest in any of these. That's my understanding, Your Honor.
>
> THE COURT: So what –
>
> MR. ROLDAN: He is a guarantor. He is a guarantor of the loan. That part is true.
>
> THE COURT: Right. So why would he have guaranteed the loan? $45 million loan?
>
> MR. ROLDAN: I don't represent Dr. Chandra, Your Honor. I wish I had friends like that, but no. I don't mean to be flip. I don't represent him and he's not here.
>
> THE COURT: Understood.

See Tr., p. 14:7-24.

70. Similarly, counsel for the Insider DIP Lender was unable to identify the persons that who own and control the Insider DIP Lender.

> THE COURT: Okay. Well, Mr. Duggan, who's your client?
>
> MR. DUGGAN: Our client is Natural Wellness UK Limited. I don't have the corporate structure for them. The director that we're dealing with is Mr. Ramdin, R-A-M-D-I-N, and is who we're dealing with. He's the person that retained us, the person that has signed off on these documents.

See Tr., p. 25:6-13.

71. The Banks note that the individual who signed the DIP Financing agreement on behalf of the Insider DIP Lender, Hemshunkur Ramdin, is also the contact person for the second largest unsecured creditor, Pan Asia Infrastructure Ltd ("Pan Asia"). See DIP Motion [ECF No. 2-2], DIP Financing agreement, p. 20; see also the Debtor's List of the 20 Largest Unsecured Claims listing Pan Asia as being owed nearly $14 million dollars. [ECF No. 21].

72. It is the Debtor's burden to identify the individuals that own and control the Debtor. It is also the Debtor's burden to demonstrate that its Chapter 11 filing was properly authorized by bona fide stockholders or board members. Full disclosure by the Debtor regarding the individual(s) that own and control the Debtor is essential. To the extent that such ownership arises from transfers by Subhash in violation of the Banks' loan agreements, full information and documentation is essential. Moreover, full disclosure of all insider creditors is also required. The Banks note that the five (5) largest unsecured creditors have apparently loaned this Debtor over $60 million dollars. Moreover, the fifth (5th) largest unsecured creditor, ATUL WY, shares the same address as the Debtor. *Who are these creditors?*

73. Further disclosure by the Debtor is required in order to determine (i) whether Debtor's Petition was properly authorized to avoid mandatory case dismissal, and (ii) whether any transfer of Subhash and/or Sushila's interests in the Debtor and its parent companies was void or otherwise invalid such that the transferee could not have validly or properly authorized the Debtor's Petition filing. Such further disclosure must include:

a. Identify and document which individuals ultimately own and control the Debtor and its parent companies, including, without limitation, the Insider DIP Lender.

b. Identify and document all stockholders and board members of the Debtor and its affiliates.

c. Identify and document all insider relationships between the Debtor and its creditors.

d. Identify which individuals authorized the Debtor's Chapter 11 filing, including copies of all articles of incorporation, operating agreements, bylaws, minutes of meetings, transfer documents and any modifications thereto; and

e. Whether Subhash and/or Sushila's interests in the Debtor and/or its parent companies were transferred, the date(s) of transfer, the transferee(s) and any individuals who own and control any transferees, the consideration exchanged for such transfers, all agreements and documents memorializing, authorizing and effectuating such transfers, including, without limitation, any documents evidencing how any such transfers were permitted under the Loan Documents.

74. If the Debtor cannot satisfactorily identify the individual(s) who own and control the Debtor and its parent companies, and demonstrate that the Debtor's filing of its Chapter 11 petition was duly authorized by the proper individuals, then the Debtor's Chapter 11 case must be dismissed.

**THE BANKS ARE NOT ADEQUATELY PROTECTED.**

75. The New York State judgment rate is nine (9%) percent. As a result, monthly interest only payments consist of $547,500.00 ($73,000,000.00 x .09 = $6,570,000.00, divided by 12 months equals $547,500.00).

76. The Debtor's gigantic losses make it impossible for the Debtor to remit interest only payments to the Banks. Rather, the Debtor proposes an adequate protection payment in November of only $179,792.00, or less than one third of the $54,750.00 required to remit interest-only payments.

77. Adequate protection may be provided by: (i) cash or periodic cash payments to the extent the use of collateral reduces the value of the creditor's interest in the property; (ii) an additional or replacement lien on other property of the debtor to offset the loss in value; and/or (iii) other relief (not an administrative expense under § 503(b)(1)) that results in the creditor receiving the "indubitable equivalent" of its interest in the property. 11 U.S.C. Sec. 361.

78. Here, it is apparent that the Debtor is incapable of making interest only payments to the Bank. Consequently, the Debtor cannot provide the Banks with the requisite adequate protection. The Banks' note that the Debtor seeks to continue utilizing its resort which inevitably results in wear and tear to the Premises, the buildings thereat and the contents thereof.

79. As a result, the Banks must be granted relief from the automatic stay in order to enforce the Foreclosure Judgment. Alternatively, the Banks must receive additional collateral from the Debtor or its affiliates in order to adequately protect the Bans' interests, combined with a ruling that the Banks hold valid first priority liens on all of the Debtor's assets.

80. As this Court accurately stated during the First Day Hearing, "how is there adequate protection"?

> THE COURT: But wait, when you say adequate, how is there adequate protection if you've got a $73,051,440 secured judgment against property that's worth only [$]45 million? How is that? Where's the adequate –
>
> MR. ROLDAN: Your Honor, the budget contemplates in the five weeks that Canara gets an interest payment, and so that provides for the adequate protection pending the final hearing. So there are payments contemplated to Canara Bank.
>
> THE COURT: It says that they don't get anything until the fifth week, and then you're going to give them 180,000?
>
> MR. ROLDAN: That's correct, Your Honor.
>
> THE COURT: How is that adequate?

Tr., p. 28:25, p. 29;1-12.

**THE BANKS MUST BE GRANTED RELIEF FROM THE AUTOMATIC STAY**

81. As demonstrated above, the Debtor admitted having only $25,000 in the bank on the Petition Date. See Tr., p. 19:18-21. Moreover, the Debtor's position is that the Premises are worth $45 million dollars. See Tr., p. 27:25, p. 28:1-2, See also the appraisals prepared by HVS Consulting & Valuation, Division of TS Worldwide, LLC and Capright attached as Exhibits U, V and W to the Menon Dec.

82. Accordingly, the Debtor's position is that the Banks are under secured. As previously demonstrated, this Debtor is incapable of remitting monthly interest only payments to the Banks. Notably, it appears doubtful that this Debtor is capable of making any monthly payments to the Banks. As a result, the Banks cannot be adequately protected by this hopelessly insolvent Debtor. Therefore, the Banks must be granted relief from the automatic stay in order to proceed with their foreclosure sale.

83. A lender can obtain relief from the automatic stay under 11 U.S.C. § 362(d) and Local Bankruptcy Rule 4001-1 when the value of the collateral is less than the amount of the secured debt and there is a lack of adequate protection or lack of equity in the collateral.

**CONCLUSION**

For the foregoing reasons, to be supplemented upon oral argument hereof, the Banks respectfully request the entry of an Order: (i) denying the Debtor's request for DIP Financing; (ii) Denying the Debtor's request for use of cash collateral; (iii) granting the Banks relief from the automatic stay in order to foreclose upon the Premises, and (iv) dismissing the Debtor's Chapter 11 case due to an apparent lack of authority for the Debtor's Chapter 11 filing.

DATED: October 20, 2026

Respectfully submitted,

**Scarinci Hollenbeck, LLC**

By: */s/ David Edelberg*
David Edelberg